# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

SHAWN MILLER, ET AL.                    *CIVIL ACTION 04-1250 c/w 05-189

VS.                                     *MAGISTRATE JUDGE HILL

GORSKI WLADYSLAW ESTATE, ET AL.  *BY CONSENT OF THE PARTIES

## ORDER

On November 15, 2006, an evidentiary hearing was held on the Motion to

Exclude or Limit Dr. Darrell L. Henderson filed by Illinois National Insurance Company

("Illinois National").  [rec. doc. 177].  Considering the Motion, the Oppositions thereto

[rec. doc. 266], Illinois National's Reply [rec. doc. 285], the attachments and exhibits

submitted by the parties, the testimony and evidence presented at the hearing, the

arguments of counsel, and the law recited on the record by the court, to which there were

no objections, the Motion to Exclude or Limit Dr. Darrell L. Henderson [rec. doc. 177] is

**GRANTED** to the extent that plaintiffs seek to introduce Dr. Henderson's estimates of a

specific number of heatstroke incidents and a specific number of surgical procedures

plaintiffs Lisa Guerra and Jose Alfaro, Jr. will suffer in the future, and is **DENIED** in all

other respects.

Illinois National challenges Dr. Henderson's qualifications and the reliability of

his testimony on the following subjects:  the likelihood of the development of future

complications which may arise from Lisa Guerra's ("Guerra's") and Jose Alfaro, Jr.'s

("Alfaro's") burns, including heatstroke, skin cancer, inpatient and outpatient surgeries

and amputations, as well as the costs associated with these occurrences; the rising cost of medical care; and the plaintiffs' disability rating and ability to return to work.[1]

Illinois National argues that Dr. Henderson, a Plastic and Reconstructive Surgeon, does not specialize in burn injuries and that only a small percentage of his practice consists of burn patients. Moreover, Dr. Henderson transfers all serious burn patients (burns over 35% of the body) to outside burn centers. Thus, Illinois National asserts that Dr. Henderson is not qualified to testify about the probability of the development of future complications associated with severe burn injuries such as those sustained by Alfaro and Guerra. Illinois National also does not believe that Dr. Henderson is qualified to opine on heatstroke, the escalation of medical costs over past years, or the plaintiffs' ability to return to work, because these subjects are outside and beyond the scope of Dr. Henderson's expertise.

Moreover, Illinois National contends that Dr. Henderson's opinions are not reliable. More specifically, Illinois National argues that Dr. Henderson's opinion regarding plaintiffs' probable future medical care is based on unknown, uncertain and unpredictable events and hence, not based on sufficient facts or data to render the testimony sufficiently reliable. With respect to heatstroke, Illinois National argues that

---

[1] Illinois National additionally challenged Dr. Henderson's qualifications and the reliability of his testimony on mental infirmities (eg. development of Alzheimers or other dementia, gradual diminution of brain function, necessity for psychotherapy), societal disruptions, unforeseeable events (eg. loss of utilities, electricity, and automobile accidents), reflex sympathetic dystrophy, orthopedic issues other than amputation, and amputations resulting from skin cancers. However, in their opposition to the Motion, and at the hearing on the Motion, plaintiffs indicated that they do not intend to offer Dr. Henderson's testimony on these subjects. Accordingly, that portion of the Motion is moot.

although Dr. Henderson may discuss in theory how the plaintiffs' conditions may render them more susceptible to heatstroke, he cannot testify as to the number of times they will suffer a heatstroke or the costs associated with treatment for these occurrences because these estimates are derived primarily from arbitrary "guesswork" and accordingly, are based on unacceptable degree of uncertainty. Likewise, with respect to the plaintiffs' need for, and number of, future amputations and surgical procedures, Illinois National argues that Dr. Henderson's opinion is speculative, rendered without any objective standards to test the accuracy of his predictions, and not supported by the literature produced by Dr. Henderson with his expert report. To the contrary, Illinois National asserts that the literature indicates a low possibility that these plaintiffs, who will undergo an aggressive regimen of wound care and treatment, will develop complications leading to amputation.

During the *Daubert* hearing Dr. Henderson admitted that he does not currently provide acute care for burn patients, rather those patients are transferred to burn centers. However, Dr. Henderson nevertheless testified as to his ample past training and experience with acute burn patients acquired during his residency at the Mayo Clinic, his fellowship at Marquette University during which time he worked at a "burn hospital" in Milwaukee, his years in the Navy during the Vietnam War, and during the early years of his private practice.[2] Moreover, as noted by plaintiffs in their opposition and as

---

[2] *See also* rec. doc. 266, Exs. 29 and 33, July 14, 2006 Supplemental Report and Dr. Henderson's Affidavit.

evidenced by his testimony at the *Daubert* hearing, Dr. Henderson's expert opinions

center primarily on long-term care and complications facing burn patients after the acute

stage, an area where Dr. Henderson has extensive training and experience.[3]  Ten percent

of Dr. Henderson's current practice is devoted to burn patients, some of whom were

burned twenty to thirty or more years ago.  He sees some of these patients every week,

providing consultation, evaluation and treatment for burn-related skin complications such

as skin breakdown and ulceration, skin tightness around and between joints, contractures,

scars and skin replacement and resurfacing.  During these weekly visits, Dr. Henderson

expresses opinions on the reasonable necessity of future care and surgical procedures,  as

well as costs for that care. Because the medical literature indicates that burn patients are

at greater risk for developing skin cancer, during his physical examination of burn

patients, Dr. Henderson looks for signs of development of skin cancer and educates his

patients on those signs to detect cancers in their early stages.[4]  With those patients who

have had burns over thirty-five percent or more of their bodies, Dr. Henderson also

discusses the serious dangers posed by heatstroke which results from impairment of a

---

[3]Indeed, Dr. Henderson testified by affidavit that his medical specialty, plastic and reconstructive surgery, is the field of medical specialty that usually assumes the primary responsibility for care and treatment of long-term burn patients; thus, plastic and reconstructive surgeons become the "primary care physicians" for these patients. rec. doc. 266, Ex. 33.  *See also* rec. doc. 266, Exs. 26, 29, 31 and 33,  *Curriculum Vitae*, July 14, 2006 Supplemental Report, and Deposition of Dr. Henderson.

[4]*See* rec. doc. 266, Exs. 37, 39, 41 and 42, B.J. Bartle, *et al.*, *" Cancers Arising from Burn Scars"*, 11:1 Journal of Burn Care & Rehabilitation 46-49 (1990); M. Novick, *et al., "Burn Scar Carcinoma: A Review and Analysis of 46 Cases"*, 17:10 Journal of Trauma 809-817 (1977); D.V. Pratt, *et al., "Burn Scar Malignancies of the Eyelids"*, 16:6 Ophthalmic Plastic and Reconstructive Surgery 432-437 (2000); M. Turegun, *et al., "Burn Scar Carcinoma with longer lag period arising in previously grafted area"*, 23:6 Burns 496-497 (1997). *See also* rec. doc. 266, Exs. 29 and 33.

burn patient's thermal regulatory system, a complication which is confirmed in medical literature.[5]

Dr. Henderson performs amputations on burn patients as part of their long-term management, performing approximately three to four amputations of fingers, toes and the mid-foot area per year, and "more substantial" amputations, such as those below the knee, every three to four years. In addition, he performed many more amputations during his years in the service. Moreover, Dr. Henderson testified that he is asked to perform amputations by orthopedists in burn cases which involve unstable skin, scars and ulcerations.[6]

Dr. Henderson testified by affidavit that almost daily he assigns disability ratings to his patient population, at least half of whom are receiving workers' compensation or social security benefits, and hence require on-going disability assessments. In making those assessments, Dr. Henderson, like the majority of physicians in his field, utilizes the guidelines of the American Medical Association, which guidelines provide an objective and medically accepted basis for such assessments and corresponding disability ratings.[7]

---

[5]*See* rec. doc. 266, Exs. 34 and 35, C. Ben-Simchon, *et al., "Heat Tolerance in Patients with Extensive Healed Burns"*, 67:4 Plastic and Reconstructive Surgery 499-504 (1981); J.L. Roskind, *et al., "Quantitation of Thermoregulatory Impairment in Patients with Healed Burns"*, 1:2 Annals of Plastic Surgery 172-175 (1978). *See also* rec. doc. 266, Exs. 29 and 33.

[6]*See also* rec. doc. 266, Ex. 33.

[7]*See* rec. doc. 266, Ex. 33.
At the *Daubert* hearing, plaintiffs' counsel indicated that Dr. Henderson's testimony would be limited to general questions about Alfaro's and Guerra's disability ratings and to equate those ratings to the American Medical Association guidelines referenced in his report. Accordingly, any challenge to Dr. Henderson's competence to testify about the plaintiffs' ability to return to work need not be addressed herein.

Finally, with respect to the current and rising cost of medical care, Dr. Henderson testified by affidavit that he participated in starting and managing the Surgical Center in Lafayette (an outpatient surgical care hospital), and that he continues to have management responsibilities for that enterprise, and additionally sits on its board of directors. Moreover, he has been in private practice for decades, having entered private practice in 1969. Thus, Dr. Henderson has first hand experience with both the costs of medical and surgical care, as well as the rise in those costs over the years.[8]

Given Dr. Henderson's extensive training and hands-on experience over a meaningful period of time, revealed in his testimony at the hearing and the exhibits and attachments submitted by the parties, Dr. Henderson has clearly developed a working expertise which qualifies him to opine on the likelihood of complications which may arise from Guerra's and Alfaro's burns, including skin breakdown and ulceration, skin tightness around and between joints, contractures, scars, skin replacement and resurfacing, the general likelihood of future inpatient and outpatient surgical procedures and amputations, and the general costs associated with treatment of these complications and procedures, as well as the plaintiffs' increased risk of heatstroke and skin cancer, the rising cost of medical care over the years, and the plaintiffs' disability ratings. *See Jones v. Lincoln Electric Co.*, 188 F.3d 709, 724 (7th Cir. 1999); FRE 702. Clearly, experts may testify

---

[8]*See* rec. doc. 266, Ex. 33.

At the *Daubert* hearing, plaintiffs' counsel indicated that Dr. Henderson's testimony would be limited to whether or not the medical costs in the Lafayette area are consistent with the costs outlined by Dr. Womack in his Report. This limitation provides further support for this court's finding that Dr. Henderson is qualified to render a reliable opinion on this subject.

within the realm of their experience.  *See Skidmore v. Precision Printing and Packaging,*

*Inc.,* 188 F.3d 606, 618 (5th Cir. 1999); FRE 702, Adv. Comm. Notes (2000) ("Rule 702

expressly contemplates that an expert may be qualified on the basis of experience.");

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999); *State v. Wommack*, 770 So.2d

365, 374 (La. App. 3rd Cir. 2000).  Such testimony is not the sort of "junk science"

*Daubert* blocks.  *Skidmore,* 188 F.3d at 618.

Additionally, Dr. Henderson's opinions on these subjects are reliable; Illinois

National's objections go to the weight of Dr. Henderson's testimony, not its admissibility.

*See Primrose Operating Co. v. National American Insurance Co.*, 382 F.3d 546, 562 (5th

Cir. 2004)*; United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077-78 (5th Cir. 1996);

*Daubert*, 113 S.Ct. at 2798.  Dr. Henderson's opinions on the likely development of future

skin complications associated with severe burn injuries such as those sustained by Alfaro

and Guerra, and the corresponding likelihood of surgical procedures to correct those

complications, is based on accepted principles within the mainstream of medicine which

have been written about by practitioners, including Dr. Henderson himself who has

written generally on the treatment of scars.[9]  Likewise, Dr. Henderson's opinion regarding

---

[9]*See* rec. doc. 266, Exs. 29 and 61, A.R. Dimick, Comprehensive Rehabilitation of Burns, 3
Pathophysiology, 16-27; D.P. Goldberg, *et al., "Reconstruction of the Burned Foot"*, 27:1 Clinics in Plastic Surgery
145-161 (2000); C.M. Ryan, *"Outcome Complications Following Burn Injury"*, American Burn Association
Postgraduate Course B, Complications in Burn Care (April 1-4, 2003);  R.L. Sheridan, *"Pruritis"*, American Burn
Association Postgraduate Course A, Neglected Topics in Burn Care (April 1-4, 2003); E.B. Evans*, et al., "Bone and
Joint Changes Following Burns",* Research in Burns: The Proceedings of the First International Congress on
Research in Burns 26-32 (1962); *See also* rec. doc. 33 citing D. Henderson, *"Scars"*, Lasers Plastic Surgery and
Dermatology, 1st Ed. (1992) and D. Henderson, *"Argon and Carbon Dioxide Laser Treatment of Hypertrophic and
Keliod Scars"*, 3 Lasers in Surgery and Medicine 271-277 (1984).

the increased risk of heatstroke and skin cancer in burn patients is recognized and well accepted within the mainstream of medicine, as evidenced by the literature written on these subjects referenced at the hearing and in Dr. Henderson's reports.[10]  This literature supports and is consistent with Dr. Henderson's opinions.  Finally, Dr. Henderson's opinions on the likelihood of future surgical procedures and amputations is supported by amputation specialist Dr. Douglas G. Smith whose opinion is based on recognized risk factors that are accepted within the mainstream of medicine, as well as by Lafayette orthopedist Dr. J. Lee Leonard,[11] and which factors have been written about in patients with chronic conditions such as diabetes and leprosy, conditions which Dr. Smith explained present the same risk factors that cause amputation in burn patients.[12]  Clearly, such expert testimony based on an expert's specialized knowledge, experience and observation while supported by evidence in the scientific community is admissible. *See Pipitone v. Biomatrix, Inc*., 288 F.3d 289, 249-250 (5th Cir. 2002) (citations omitted).

---

[10]*See* fns. 4 and 5, *supra*.  The court finds further support for its finding that Dr. Henderson's testimony regarding skin cancer is not based on mere conjecture or speculation by the fact that plaintiffs do not intend to ask Dr. Henderson whether either Alfaro or Guerra will or will not get skin cancer in the future, but rather plaintiffs intend solely to ask Dr. Henderson if they are at a higher risk of getting skin cancer in the future.

[11]*See* rec. doc. 302; Deposition of Dr. J. Lee Leonard [rec. doc. 295, Ex. A, at pg. 15-16, 45-46].

[12]*See* rec. docs. 302 and 266, Exs. 57 and 58, E.J. Boyco, *et al.*, *"A Prospective Study of Risk Factors for Diabetic Foot Ulcer"*, 22 Diabetes Care 1036-42 (1999);  R.E. Pecoraro, *et al.*, *"Pathways to Diabetic Limb Amputation: Basis for Prevention"* 13 Diabetes Care 513-521 (1990).  *See also* rec. doc. 266, Ex. 59, P.W. Brand, *"Management of the Insensitive Limb"*, 59 Physical Therapy 8-12 (1979).
Plaintiffs intend to ask Dr. Smith whether it is more probable than not that Guerra and Alfaro will need amputations in the future.  *See* rec. doc. 302.  During the *Daubert* hearing, plaintiffs' counsel indicated that with respect to amputation, Dr. Henderson will be asked if he concurs in the recommendation and views of Dr. Smith, and that he will not be asked questions to independently prove the testimony that will be elicited from Dr. Smith.  To the extent that Dr. Henderson's testimony may be cumulative, this ruling reserves the defendant's right to object at trial on this ground.

The *Daubert* analysis should not supplant trial on the merits, nor should it serve as a replacement for the adversary system. *Pipitone*, 288 F.3d at 461; F.R.E. 702, Adv. Comm. Notes (2000). In this case, the court concludes that the jury is entitled to hear Dr. Henderson's opinions on the challenged subjects outlined above. Vigorous cross-examination of Dr. Smith and presentation of contrary evidence is the appropriate means of attacking Dr. Henderson's admissible expert opinion evidence. *See Daubert*, 113 S.Ct. at 2798.

However, to the extent that plaintiffs' intend to introduce Dr. Henderson's estimates of the number of heatstroke incidents and surgical procedures plaintiffs Lisa Guerra and Jose Alfaro, Jr. will suffer in the future[13], those estimates do not satisfy the standard of evidentiary reliability mandated by Rule 702 as interpreted in *Daubert*. Although Dr. Henderson testified at the *Daubert* hearing that he routinely tells his patients the number of surgical procedures which he believes they may expect in the future, those estimates, like the estimates Dr. Henderson has made for Alfaro and Guerra, are just that, estimates based on Dr. Henderson's subjective beliefs. These estimates are not based on any objective facts, data or criteria, and are not supported by any generally

---

[13]Dr. Henderson opined that during his lifetime Alfaro will need twenty in-hospital surgeries, fifteen hospitalizations without surgery and twenty outpatient surgeries to treat skin ulcers and wounds, that during her lifetime Guerra will need ten in-hospital surgeries, ten hospitalizations without surgery and twenty outpatient surgeries for wound care, that Alfaro will need ten hospitalizations for heat stroke during the course of his lifetime and that Guerra will need two such hospitalizations during the course of her lifetime. [rec. doc. 266, Ex. 27, pg. 11, 17 and 18, and Ex. 28, pg. 8, 12].

accepted medical premise, literature or peer reviewed articles or other publications.

Rather, all that has been offered to the court in support of the reliability of these estimates

is Dr. Henderson's own assurance that based on his experience with other patients, the

estimates made for Alfaro and Guerra are reliable.

Under *Daubert*, an expert's "self-proclaimed" reliability is insufficient; the

testimony must be supported by "more than subjective belief and unsupported

speculation." *Black v. Food Lion, Inc.,* 171 F.3d 308, 311 (5th Cir.1999) citing *Kumho,*

119 S.Ct. at 1179*; Daubert,* 509 U.S. at 590; *Barrett v. Atlantic Richfield Co.,* 95 F.3d

375, 382 (5th Cir. 1996) (upholding exclusion of expert testimony where the testimony

"would consist of unsupported speculation."); *See also In re Paoli R.R. Yard PCB*

*Litigation*, 35 F.3d 717, 742 (3rd Cir. 1994). Thus, expert evidence that is based solely

on the *ipse dixit* of the expert need not be admitted. *General Electric v. Joiner*, 522 U.S.

136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Rather, a court may conclude in such

cases that there is simply too great an analytical gap between existing data and the

opinion proffered. *Id*. That is the case herein. Dr. Henderson's estimates are

unsupported and based largely on speculation and conjecture. However, "[t]he courtroom

is not a place for scientific guesswork ...." *Rider v. Sandoz Pharmaceuticals Corp*., 295

F.3d 1194, 1202 (11th Cir. 2002) citing *Rosen v. Ciba-Geigy Corp*., 78 F.3d 316, 319 (7th

Cir.1996). The court therefore concludes that Dr. Henderson's estimates of the number of

heatstroke incidents and surgical procedures plaintiffs Lisa Guerra and Jose Alfaro, Jr. will suffer in the future are unreliable, and as such, are inadmissible.

Signed at Lafayette, Louisiana on December 6, 2006.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE