United States Court of Appeals
Fifth Circuit

**F I L E D**
October 23, 2008

# UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

Charles R. Fulbruge III
Clerk

U. S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

NOV 19 2008

ROBERT H. SHEMWELL, CLERK
BY_____
          DEPUTY

No. 07-30378

D.C. Docket No. 6:05-CV-189
                6:04-CV-1250

SHAWN MILLER, etc

              Plaintiff

BATON ROUGE GENERAL MEDICAL CENTER

              Intervenor Plaintiff - Appellee

    v.


GORSKI WLADYSLAW ESTATE; ET AL

              Defendents

JOSE ANGEL ALFARO, JR; GRACIELA MARROQUIN

              Intervenor Defendants - Appellants
-----------------------------------------------------------
JOSE ANGEL ALFARO, JR; GRACIELA MARROQUIN

              Plaintiffs - Intervenor Defendants - Appellants

    v.

BATON ROUGE GENERAL MEDICAL CENTER

              Intervenor Plaintiff - Appellee


    v.


ALLIED VAN LINES INC; ET AL

              Defendants



              Appeal from the United States District Court for the
                   Western District of Louisiana, Lafayette.

Before JONES, Chief Judge, and BARKSDALE and STEWART, Circuit
Judges.

### J U D G M E N T

This cause was considered on the record on appeal and was
argued by counsel.

It is ordered and adjudged that the judgment of the District
Court is affirmed.

IT IS FURTHER ORDERED that Appellants pay to Appellee the
costs on appeal to be taxed by the Clerk of this Court.

ISSUED AS MANDATE: **NOV 1 4** 2008

A True Copy
Attest **NOV 1 4** 2008

Clerk, U.S. Court of Appeals, Fifth Circuit

By: _Carshell Johnson_
Deputy

New Orleans, Louisiana

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

NOV 1 9 2008

RO_____ _____ CLERK
BY_____
        DEPUTY

United States Court of Appeals
Fifth Circuit

# FILED

October 23, 2008

Charles R. Fulbruge III
Clerk

_____

No. 07-30378

_____

SHAWN MILLER, ETC

           Plaintiff

BATON ROUGE GENERAL MEDICAL CENTER

           Intervenor Plaintiff – Appellee

v.

GORSKI WLADYSLAW ESTATE; ET AL

           Defendants

JOSE ANGEL ALFARO, JR; GRACIELA MARROQUIN

           Intervenor Defendants – Appellants

----------------------------------------------------------------------------------

JOSE ANGEL ALFARO, JR; GRACIELA MARROQUIN

           Plaintiffs – Intervenor Defendants – Appellants

v.

BATON ROUGE GENERAL MEDICAL CENTER

           Intervenor Plaintiff – Appellee

v.

ALLIED VAN LINES INC; ET AL

           Defendants

No. 07-30378

————————————

Appeal from the United States District Court
for the Western District of Louisiana

————————————

Before JONES, Chief Judge, and BARKSDALE and STEWART, Circuit Judges.
EDITH H. JONES, Chief Judge:

Jose Alfaro ("Alfaro") received emergency medical care at Baton Rouge General Medical Center ("Baton Rouge General") after he was injured in a car accident. This appeal concerns Baton Rouge General's efforts to get paid for the medical care it provided Alfaro. The question presented is whether a hospital that is required by law to provide emergency medical care to an uninsured patient, who later becomes eligible for Medicaid, may seek to collect payment for the patient's medical bills by enforcing a lien against a settlement the patient recovered from a third-party tortfeasor rather than billing Medicaid. The district court ruled that Baton Rouge General could enforce its lien against Alfaro's tort settlement. Alfaro appeals that decision. We affirm.

## BACKGROUND

On July 20, 2003, Alfaro was severely burned in an automobile collision in St. Martin Parish, Louisiana, with an Allied Van Lines, Inc., ("Allied") truck. Following the accident, he was flown by helicopter to Baton Rouge General for emergency medical treatment. At the time of his admission to the hospital, Alfaro was uninsured and ineligible for Louisiana Medicaid benefits. Baton Rouge General was required by the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd, to treat him. Alfaro remained in the hospital from July 20 until October 31, 2003; the cost for two and a half months' hospitalization exceeded $1.2 million.

In August 2003, Alfaro and other accident victims filed a federal lawsuit against Allied and the truck owner seeking damages for their injuries. Baton

2

Rouge General obtained a copy of Alfaro's accident report about a month later. On October 21, before Alfaro was discharged, the hospital filed a statutory privilege, *i.e.*, a lien, for recovery of Alfaro's medical expenses against any settlement or judgment he recovered from Allied and its insurers (collectively "Allied"). *See* LA. REV. STAT. ANN. § 9:4751 *et seq.* Two months later, Allied's attorney indicated to Baton Rouge General his belief that it could recover the full amount of Alfaro's medical expenses from Allied. He confirmed that Allied had more than enough insurance coverage to pay the hospital's lien.

While Alfaro was hospitalized, Baton Rouge General referred him to a third-party vendor to assist him in seeking supplemental security income ("SSI") benefits from the Society Security Administration. When the hospital learned that he had been approved for SSI benefits, which made him eligible to receive Medicaid benefits in Louisiana, the hospital informed Alfaro's attorney that it would not bill Medicaid for Alfaro's medical expenses. Nevertheless, out of an abundance of caution, the hospital sought retroactive Medicaid approval from the Louisiana Department of Health and Hospitals ("LDHH"), the state Medicaid agency, for Alfaro's stay. LDHH approved, but it warned that "an approval is not a guarantee of the recipients['s] eligibility [and] [p]ayment on a claim will only be made when the claim is billed correctly and all conditions for payment are met." In the end, Baton Rouge General neither sought from nor was reimbursed by Medicaid for Alfaro's expenses.

Baton Rouge General chose instead to pursue its statutory lien against Alfaro's settlement or judgment by intervening in Alfaro's lawsuit against Allied. In January 2006, Alfaro, his co-plaintiffs, and Allied finalized a $21 million settlement, with $7 million earmarked for Alfaro. The settlement agreement does not allocate funds between past medical expenses and other damages, but it expressly requires Alfaro "to reserve and hold in trust" funds necessary to satisfy "all known liens, interventions and other claims" until such claims are

3

No. 07-30378

validly released and the judicial proceedings asserting such claims are dismissed with prejudice. It also requires him to defend, indemnify, and hold Allied harmless from "any claims asserted by anyone against [Allied] to recover for services rendered or payments made to or on behalf of plaintiffs . . . ." In accordance with this agreement, Alfaro deposited the full amount claimed by Baton Rouge General in the registry of the district court.

The hospital moved for partial summary judgment to recover the deposited settlement funds. Baton Rouge General contended that even though Alfaro became eligible for Medicaid benefits after he was discharged from the hospital it was not required to bill Medicaid and indeed was legally compelled to seek payment from any responsible third party before billing Medicaid. In a cross-motion, Alfaro countered that once he became eligible for Medicaid, the hospital had to bill Medicaid. He also argued that enforcement of the hospital's lien would constitute recovery not from Allied but from Alfaro, a result prohibited by state and federal mandates. By consent of the parties, a magistrate judge considered both motions. In a well-written opinion, the judge denied Alfaro's motion and granted Baton Rouge General's motion, awarding it $1,217,368.99 plus interest. Alfaro filed this appeal.[1]

## STANDARD OF REVIEW

This court reviews a grant of summary judgment *de novo*, applying the same legal standard as the district court. *Chacko v. Sabre, Inc.*, 473 F.3d 604, 609 (5th Cir. 2006). Summary judgment is appropriate when the evidence

---

[1] Alfaro's notice of appeal of the partial summary judgment in favor of Baton Rouge General was premature because the district court's order was not a final judgment. The judgment neither disposed of the claims against all the defendants nor was it certified as a final judgment pursuant to Federal Rule of Civil Procedure 54(b). *Young v. Equifax Credit Info. Servs., Inc.*, 294 F.3d 631, 634 n.2 (5th Cir. 2002). Nonetheless, we have jurisdiction over this appeal because the magistrate judge's "order would have been appealable if the district court had certified it pursuant to Rule 54(b) and because the district court did subsequently (and prior to oral argument herein) dispose of all remaining parties and claims . . . ." *Id.*

4

No. 07-30378

demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

## DISCUSSION

Congress established Medicaid in 1965 through Title XIX to the Social Security Act, 42 U.S.C. § 1396 *et seq.*, "for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons." *Harris v. McRae*, 448 U.S. 297, 301, 100 S. Ct. 2671, 2680 (1980). Under this system of "cooperative federalism," if a state agrees to establish a Medicaid plan, the federal government agrees to pay a specified percentage of the total amount the state plan spends on medical assistance. *Id.* at 308, 100 S. Ct. at 2683-84. The federal Medicaid statute defines "medical assistance" as "payment of part or all of the cost of [covered] care and services . . . ." 42 U.S.C. § 1396d(a). Although participation in the Medicaid program is entirely voluntary, once a state elects to participate, it must comply with federal statutory and regulatory requirements. *See S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 585-86 (5th Cir. 2004). Despite these requirements, "the Medicaid statute gives each state flexibility in designing and administering its own Medicaid program." *La. Dept. of Health and Hosps. v. Ctr. for Medicare and Medicaid Servs.*, 346 F.3d 571, 572 (5th Cir. 2003).

This case concerns federal and state statutes and regulations governing third-party liability and provider reimbursement under Medicaid. Alfaro contends that, when he became "eligible" for Medicaid, the hospital was no longer permitted to pursue a third-party recovery action against Allied, the tortfeasor—only the State Medicaid agency could do so. Further, he asserts that, when he became "eligible" for Medicaid, the hospital had no right as a Medicaid provider to assert its statutory lien against Alfaro's share of the settlement.

## 1. Can Baton Rouge General seek third party reimbursement?

For purposes of this section, we assume *arguendo* that when Alfaro

5

became "eligible" for Louisiana Medicaid, whether or not the hospital availed itself of Medicaid coverage, the Medicaid regime applied to the hospital's reimbursement rights.

We first consider whether a state agency alone can pursue third-party liability claims. "Congress, in crafting the Medicaid legislation, intended that Medicaid be a 'payer of last resort.'" *Ark. Dept. of Health and Human Servs. v. Ahlborn*, 547 U.S. 268, 291, 126 S. Ct. 1752, 1767 (2006). "This means that all other available resources must be used before Medicaid pays for the medical care of an individual enrolled in a Medicaid program." *Caremark, Inc. v. Goetz*, 480 F.3d 779, 783 (6th Cir. 2007). Because Medicaid is essentially a "payer of last resort," federal law requires "states to implement 'third party liability (TPL) programs' which ensure that Federal and State funds are not misspent for covered services to eligible Medicaid recipients when third parties exist that are legally liable to pay for those services.'" *Wesley Health Care Ctr., Inc., v. DeBuono*, 244 F.3d 280, 281 (2d Cir. 2001) (quoting Medicaid Programs; State Plan Requirements and Other Provisions Relating to State Third Party Liability Programs, 55 Fed. Reg. 1423, 1423-24 (1990)).

A third party is "any individual, entity or program that is or may be liable to pay all or part of the expenditures for medical assistance furnished under a State [Medicaid] plan." 42 C.F.R. § 433.136. The federal Medicaid statute requires that each state's Medicaid agency take measures to find out when third parties, such as private insurers and Medicare, are legally obliged to pay for services covered by Medicaid. *Wesley Health Care Ctr.*, 244 F.3d at 281 (citing 42 U.S.C. § 1396a(25)(A)). Each state Medicaid plan must include "a plan . . . for pursuing claims against such third parties." *Id.* If third party liability is found to exist after the agency has provided medical assistance, the state agency must seek reimbursement for such assistance. *Id.* (citing 42 U.S.C. § 1396a(25)(B)).

No. 07-30378

The Centers for Medicare and Medicaid Services ("CMS")[2] has issued implementing regulations that outline two methods for handling third party liability: "cost avoidance" and "pay and chase." When the probable liability of a third party is established at the time a claim is filed, the state Medicaid agency must reject the claim and return it to the provider for a determination of the amount of third-party liability. 42 C.F.R. § 433.139(b)(1). The state agency must pay the difference if the third party's liability does not at least equal the amount the provider is entitled to under Medicaid. *Id.* "This method of payment is called 'cost avoiding;' it entails shifting to the provider the burden of securing payment from third parties." *Wesley Health Care Ctr.*, 244 F.3d at 282.

The other method of handling third-party liability is called "pay and chase." Under this method, the state Medicaid agency "pays the total amount allowed under the agency's payment schedule and then seeks reimbursement from the liable third party." *Id.* (quoting Medicaid Programs; State Plan Requirements and Other Provisions Relating to State Third Party Liability Programs, 55 Fed. Reg. 1423, 1425 (1990)). The "pay and chase" method is used if the probable existence of third party liability cannot be established or third party benefits are not available to pay the patient's medical expenses at the time a Medicaid claim is filed. *See* 42 C.F.R. § 433.139(c); 42 U.S.C. § 1396a(a)(25)(B). The federal regulations permit, or even require, the state Medicaid agency to use the "pay and chase" method in certain specific circumstances, for example, where labor, delivery, or postpartum care is involved. *See* 42 C.F.R. § 433.139(b)(2), (3). A state Medicaid agency may also use the "pay and chase" method when it is cost effective to do so and it receives a waiver from CMS. *See* 42 C.F.R. § 433.139(e).

---

[2] CMS is an agency within the U.S. Department of Health and Human Services. Before July 2001, CMS was known as the Health Care and Financing Administration ("HCFA"). *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 586 n.2 (5th Cir. 2004).

Louisiana law complies with these federal mandates. *See* LA. REV. STAT. ANN. § 46:446.2. In addition, Louisiana law requires providers to bill other insurers and third parties that are liable for a patient's medical expenses before they bill Medicaid. *See* LA. REV. STAT. ANN. § 46:437.12 (requiring Medicaid providers to enter into a provider agreement with the state Medicaid agency that requires the provider to "[b]ill other insurers and third parties . . . before billing the [state Medicaid program], if after reasonable inquiry it is known that the [Medicaid eligible patient] is eligible for payment for health care or related services from another insurer or person . . . .").

Alfaro argues that Louisiana's requirement conflicts with federal Medicaid law concerning third-party liability. He contends that the federal Medicaid scheme "entrusts the right and duty of recovering funds from third parties to the [state] Medicaid agency—not the health care provider—upon a determination of eligibility." We find this argument unconvincing and, therefore, hold that Louisiana's law requiring health care providers to bill third-parties before billing Medicaid does not conflict with federal law.

Alfaro first asserts that the responsibility of seeking reimbursement from a liable third party is entrusted to the state Medicaid agency, not the health care provider. To support his assertion, he cites the federal Medicaid statute's mandate that a state Medicaid plan require the state Medicaid agency to "take all reasonable measures to ascertain the legal liability of third parties . . . to pay for care and services available under the plan . . . ." 42 U.S.C. § 1396a(a)(25)(A).[3]

---

[3] (a) . . .

A state plan for medical assistance must–

. . .

(25) provide–

(A) that the State or local agency administering such plan will take all reasonable measures to ascertain the legal liability of third parties (including health insurers, self-insured plans, group health plans (as defined in section 1167(1) of Title 29), service benefit plans, managed care organizations, pharmacy benefit managers, or other parties that are

8

Louisiana law complies with this provision. LA. REV. STAT. ANN. § 46:446.2(C)(1).[4] Federal law does not explicitly entrust a state Medicaid agency with the sole responsibility of seeking reimbursement from third parties. Instead, it requires the agency to (a) collect information about third party liability so that the agency can pursue a claim against a third party if it needs to do so and (b) prepare "a plan" for pursuing such claims. 42 U.S.C. § 1396a(a)(25)(A)(i), (ii). Nothing in the statute prohibits a state from requiring a health care provider to bill a third party before it bills Medicaid.

As further support for his argument, Alfaro cites the federal Medicaid provision stating that if a third party's liability for a patient's medical expenses is found to exist *after* a state agency has paid a provider's claim, the agency must "seek reimbursement for such [medical] assistance to the extent of such legal liability." 42 U.S.C. § 1396a(a)(25)(B); *see also* 42 C.F.R. § 433.139(d)(2). Critically, the agency's responsibility to pursue the third party does not come into effect until *after* the Medicaid agency has paid a provider's claim. Congress

---

by statute, contract, or agreement, legally responsible for payment of a claim for a health care item or service) to pay for care and services available under the plan, including–

(i) the collection of sufficient information (as specified by the Secretary in regulations) to enable the State to pursue claims against such third parties, with such information being collected at the time of any determination or redetermination of eligibility for medical assistance, and

(ii) the submission to the Secretary of a plan (subject to approval by the Secretary) for pursuing claims against such third parties, which plan shall be integrated with, and be monitored as a part of, the Secretary's review of, the State's mechanized claims processing and information retrieval systems required under section 1396(r) of this title.

42 U.S.C. § 1396a(a)(25)(A).

[4] Under LA. REV. STAT. ANN. § 46:446.2(C)(1), the LDHH is required to "[u]ndertake all reasonable measures to ascertain the legal liability of third parties, including the collection of sufficient information to enable the department to pursue claims against such third parties." Further, the law provides that "[t]his information shall be collected at the time of any determination or redetermination of eligibility for Medicaid." *Id.*

chose not to mandate that a state agency seek reimbursement from a liable third party *before* it pays a Medicaid claim. Louisiana, therefore, is entirely free to delegate to a health care provider, rather than the state Medicaid agency, the obligation to seek reimbursement from a liable third party *before* it bills Medicaid.

Next, Alfaro asserts that 42 C.F.R. § 433.139 requires a health care provider to bill a state Medicaid agency (and submit to whatever reimbursement limit Medicaid prescribes) as soon as a patient becomes "eligible" for Medicaid. But § 433.139 does not contain such a requirement. It merely describes the procedures that a state Medicaid agency must follow *if* a provider submits a Medicaid claim to it for reimbursement and a third party is liable for the patient's medical expenses. Moreover, this regulation does not prohibit a state from allocating to the provider the burden of collecting third-party payments *before* it bills Medicaid. As mentioned, § 433.139 states that if a provider submits a Medicaid claim and the probable liability of a third party is established at the time the claim is filed, the state Medicaid agency must, with limited exceptions, reject the claim and require the provider to "chase" the third party. *See* 42 C.F.R. § 433.139(b).[5] Louisiana's law is entirely consistent with this regulation: It simply authorizes a provider to collect from a third-party earlier in the payment process.[6]

---

[5] "If the agency has established probable existence of third party liability at the time the claim is filed, the agency must reject the claim and return it to the provider for a determination of the amount of liability. The establishment of third party liability takes when the agency receives confirmation from the provider or a third party resource indicating the extent of third party liability. When the amount of liability is determined, the agency must then pay the claim to the extent that payment allowed under the agency's payment schedule exceeds the amount of the third party's payment." 42 C.F.R. § 433.139(b)(1).

[6] Louisiana's law requiring health care providers to bill third parties before billing Medicaid mirrors other state laws. *See, e.g., Wesley Health Care Ctr.*, 244 F.3d at 282 (New York regulations disallow Medicaid reimbursement to Medicaid providers unless the provider has first "sought reimbursement from liable third parties"); *Caremark*, 480 F.3d at 784 (under

No. 07-30378

We conclude that even if Alfaro is deemed a Medicaid patient simply because of his "eligibility" for coverage, the hospital was within its rights under Louisiana and federal law to pursue the third-party tortfeasor before it sought Medicaid reimbursement.

## 2.   Could Baton Rouge General opt out of Medicaid in order to pursue recovery from the tortfeasor?

We turn now to the issue of provider reimbursement. Alfaro argues that federal and state statutes and regulations limiting the ability of providers to obtain reimbursement for their services under Medicaid prohibit Baton Rouge General from enforcing its hospital lien.

Federal law does not require health care providers to participate in a state's Medicaid program. *See* 42 U.S.C. § 1396a(a)(23) (a state Medicaid plan must provide that "any individual eligible for medical assistance . . . may obtain such assistance from any institution, agency, community pharmacy, or person qualified to perform the service or services required . . . *who undertakes to provide him such services . . . .*" (emphasis added)). *See Barney v. Holzer Clinic, Ltd.*, 110 F.3d 1207, 1211-12 (6th Cir. 1997) ("The extremely detailed federal Medicaid statute does not require a particular hospital to participate in the Medicaid program."). Instead, a health care provider "voluntarily contracts with [a] state to provide services to Medicaid-eligible patients in return for reimbursement from the state at . . . specified rates." *Spectrum Health Continuing Care Group v. Bowling*, 410 F.3d 304, 313 (6th Cir. 2005).   Even

---

Tennessee's regulations, providers should not bill Medicaid until "other probable third party resources to the [Medicaid patient] have been collected"); *Petition of Maxi Drug, Inc.*, 915 A.2d 480, 481-82 (N.H. 2006) (statute states that "NH Medicaid is the payor of last resort, therefore, you are asked to bill any other third party resource(s) prior to submitting to NH Medicaid"); *Atlanticare Med. Ctr. v. Comm'r of Div. of Med. Assistance*, 785 N.E.2d 346, 347-48 (Mass. 2003) (citing Massachusetts regulations, which require that "all [Medicaid] providers must make diligent efforts to obtain payment first from other resources, including personal injury protection (PIP) payments, so that the [Medicaid state agency] will be the payer of last resort").

No. 07-30378

those health care providers that "do choose to serve patients under Medicaid need not accept all such patients." *Barney*, 110 F.3d at 1211-12 (citing 42 U.S.C. § 1396a(a)(23) and 42 C.F.R. § 431.51(b)(1)).[7] *Barney* adds:

> Because the remuneration provided under Medicaid is often significantly less than that provided by private insurers or Medicare, health care providers, either in the interest of higher profits or merely to remain solvent, sometimes limit the number of Medicaid patients they will accept. So long as these strategies do not otherwise violate the Medicaid statute or other federal antidiscrimination laws they are not in themselves prohibited.

*Id.* (citation omitted).

What Medicaid does not allow is for a provider who accepts Medicaid coverage for a patient to recover more than the program's reimbursement rates for care. *See* 42 C.F.R. § 447.15. Moreover, a "state plan must provide that in the case of an individual who is entitled to medical assistance under [a] State plan with respect to a service for which a third party is liable for payment, the person furnishing the service may not seek to collect from the individual (or any financially responsible relative or representative of that individual) payment of an amount for that service" if third party liability equals or exceeds the amount Medicaid will pay. 42 U.S.C. § 1396a(a)(25)(C); *see also* 42 C.F.R. § 447.20(a). Louisiana accordingly requires health care providers that want to participate in the state's Medicaid program to agree to "[a]ccept payment from [Medicaid] as payment in full," and not to bill or collect "any additional amount from the recipient or the recipient's responsible party . . . ." LA. REV. STAT. ANN. § 46:437.12(10)(a);[8] *see also* LA. REV. STAT. ANN. § 46:446.5(B) (further

---

[7] The implementing regulations, 42 C.F.R. § 431.51(b)(1), elaborate that a state Medicaid plan must provide that "a recipient may obtain Medicaid services from any institution, agency, pharmacy, person, or organization that is . . . [q]ualified to furnish the services; and . . . *[w]illing to furnish them to that particular recipient*." *Id.* (emphasis added).

[8] Specifically, the provider agreement states: "I agree to accept Medicaid payment for covered services as payment in full and not seek additional payment from any recipient for any

implementing limitation of recovery from individual third parties above Medicaid limits).

Alfaro asserts that these limitations prohibit Baton Rouge General from enforcing its lien against the tort settlement he recovered from Allied. Specifically, he contends that the hospital's enforcement of its lien is an impermissible effort to collect payment from a Medicaid-eligible patient when a third party, Allied, is liable for the patient's medical expenses. Baton Rouge General counters that enforcement of the lien is permissible because it is trying to recover from Allied, not Alfaro. We assume, without deciding, that under Louisiana's hospital lien statute Baton Rouge General by enforcing its lien is seeking to collect payment from Alfaro rather than Allied.

Alfaro's central argument is that once a patient becomes "eligible" for Medicaid a health care provider cannot seek to collect payment from that patient if a third party is liable for the patient's medical expenses. This argument, however, is inconsistent with the voluntary nature of the hospital's participation in the program. Case law uniformly indicates that the limitations on provider reimbursement are triggered not when a patient becomes "eligible" for Medicaid, but when a provider elects to bill and accepts payment from Medicaid for the services it provides to the patient. *See, e.g., Spectrum Health Continuing Care Group v. Bowling*, 410 F.3d 304 (6th Cir. 2005); *Evanston Hosp. v. Hauck*, 1 F.3d 540 (7th Cir. 1993); *Mallo v. Pub. Health Trust of Dade County*, 88 F. Supp. 2d 1376 (S.D. Fla. 2000).[9]

---

unpaid portion of a bill, with the exception of state-funded spend-down Medically Needy recipients as indicated by the agency's form 110-MNP or any recipient co-payments as established by the DHH . . . ."

[9] *See also Lizer v. Eagle Air Med. Corp.*, 308 F. Supp. 2d 1006, 1009 (D. Ariz. 2004) (holding that provider, who has already accepted Medicaid, is prohibited from enforcing a lien against a third-party tortfeasor to recover its customary fee); *Olszewski v. Scripps Health*, 69 P.3d 927, 941-42 (Cal. 2003) (invalidating a state statute which authorized a provider to recover its customary fee through a lien against a judgment or settlement obtained by a

No. 07-30378

In particular, the courts have interpreted 42 U.S.C. § 1396a(a)(25)(C), which provides that a state Medicaid plan must prohibit health care providers from collecting payment from a patient entitled to Medicaid if a third-party is liable for the patient's medical expenses, as a prohibition on "balance billing" and "substitute billing." *See, e.g., Spectrum*, 410 F.3d at 314; *Evanston*, 1 F.3d at 542. Balance billing occurs when a provider accepts payment from Medicaid and then seeks to recover from the patient the balance between that payment and its customary fee. *See Spectrum*, 410 F.3d at 314. Substitute billing occurs when a provider accepts payment from Medicaid and then tries to return the payment in order to recover its entire customary fee from the patient. *See, e.g., Evanston*, 1 F.3d at 542. Logically, a provider cannot attempt to engage in "balancing billing" or "substitute billing" unless it has initially billed Medicaid. Therefore, the prohibition against these practices is not triggered until a provider bills and accepts payment from Medicaid for services provided to a Medicaid-eligible patient.

In *Evanston*, the Seventh Circuit held that billing and accepting payment from Medicaid prevented a hospital from later seeking to enforce its hospital lien against the damages award a patient recovered from a third-party tortfeasor liable for his medical expenses. 1 F.3d at 542. There, a hospital treated an uninsured, Medicaid-eligible patient who suffered injuries in an accident. The hospital billed and accepted payment from Medicaid for the services it furnished to him. After receiving the Medicaid payment, which was less than its customary fee, the hospital served a hospital lien on a personal injury lawsuit

---

Medicaid beneficiary against a third-party tortfeasor); *Pub. Health Trust v. Dade County Sch. Bd.*, 693 So. 2d 562, 566 (Fla. Dist. Ct. App.1997) (holding that a state regulation which permits a provider to recover its customary fee after receiving a Medicaid payment is invalid under Supremacy Clause); *Palumbo v. Myers*, 197 Cal. Rptr. 214, 222-23 (Cal. Ct. App. 1983) (holding that doctor, who had already accepted Medicaid payment, was prohibited from suing patient to recover his customary fee from settlement recovered from third-party tortfeasor).

brought on the patient's behalf against the third party tortfeasor. *Evanston Hospital v. Hauck*, No. 92 C 732, 1992 WL 205900, at *1 (N.D. Ill. Aug. 19, 1992) (unpublished). Several years later, when the patient won a multimillion dollar judgment in his personal injury lawsuit, the hospital sought to enforce its lien against the judgment to recover its full customary fee.

The Seventh Circuit concluded that the hospital could not return the Medicaid payment and enforce its lien because it had already accepted money from Medicaid for the services it furnished to the patient. The court, however, explicitly stated that the hospital could have enforced its lien against the patient's damages award if it had not accepted the Medicaid payment:

> Evanston Hospital was not "forced" to abandon its right to sue Hauck; no one coerced the hospital into cashing a $113,424 check from the taxpayers as partial reimbursement for Hauck's medical bills. Rather, the hospital could have simply forsaken Medicaid and taken its chances that Hauck would somehow come up with the money to pay the bills himself. By opting for reimbursement from Medicaid, Evanston Hospital bought certainty. It purchased a guarantee of partial payment in lieu of possibly full payment or possibly no payment at all. Risk-averse companies that are owed money (or which do not want the hassle) make this same deal all the time with collection agencies-something secure is traded for a crack at a higher sum. Evanston Hospital wants out of its agreement with Medicaid now only because its gamble, in retrospect, was unwise.

*Evanston Hospital*, 1 F.3d at 542.

The Sixth Circuit reached the same conclusion in *Spectrum*. In that case, a health care center treated a patient who had been injured during a botched surgery. At the time she was admitted to the center, the patient was uninsured and ineligible for Medicaid. The center agreed to admit her on the condition that she execute a lien on the proceeds of any settlement or verdict she recovered in a medical malpractice lawsuit. Five months after the patient was admitted to the center, she became eligible for Medicaid. Because the center did not know when, or if, it would recover on its lien, it decided to bill and accept payments

from Medicaid for her medical care. These payments were less than the center's customary fees. Three years later, when the patient recovered a settlement from a third-party tortfeasor, the center tried to enforce its lien against the settlement to recover the balance between the Medicaid payments it had accepted and its customary fees.

As in *Evanston Hospital*, the Sixth Circuit denied recovery because the center had already accepted Medicaid payments as payment in full and enforcing the lien would be an attempt to recover from the patient when a third party was liable for her medical expenses. The court noted, however, that the hospital could have avoided this result:

> Spectrum [the health care center] was not required to seek payment from Medicaid; instead, Spectrum could have provided its services in exchange for enforcing its lien, which was the original agreement between the parties. Having chosen to accept payment from Medicaid however, Spectrum abandoned all rights to further recovery of its customary fee from the lien. As we have stated, Medicaid is a contract between a service provider and the government, in which the Medicaid recipient is a third-party beneficiary. By accepting the Medicaid payment, the service provider accepts the terms of the contract—specifically that the Medicaid amount is payment in full. If this arrangement is not acceptable to [service providers], they should not take Medicaid money in the first instance.

*Spectrum*, 410 F.3d at 315 (internal quotation marks and citations omitted). Moreover, the court remarked that "[if the health care center] had not received Medicaid payments, the lien would be enforceable against [the tort settlement] as a voluntary agreement entered into by willing parties, even though the patient was Medicaid-eligible." *Spectrum*, 410 F.3d at 316 (citation omitted). Once the health care center "accepted the Medicaid payment, however, [it] had been paid in full for the services provided to [the patient]. The mere fact that a prior voluntary agreement existed is without consequence." *Spectrum*, 410 F.3d at 316 (footnote omitted).

In *Mallo v. Public Health Trust of Dade County*, 88 F. Supp. 2d 1376 (S.D. Fla. 2000), the court held that after a hospital accepted payment from Medicaid it could not enforce a pre-existing lien against a tort settlement recovered by the patient. But the court noted that the hospital could have enforced its lien if it had not accepted payment from Medicaid. Specifically, the court stated that the federal mandate prohibiting "balance billing," 42 U.S.C. § 1396a(25)(C),

> [f]orc[es] providers to make a calculated choice whether to apply for Medicaid assistance. Once a health care provider commits to Medicaid assistance for a patient, the provider is barred from billing the patient for an amount in excess of the State's Medicaid disbursement. By contrast, should the health care provider elect not to apply for Medicaid assistance, then the provider can charge the market value of the treatment.

*Mallo*, 88 F. Supp. 2d at 1386-87 (footnote omitted).

From these cases, it is clear that the limitations on a health care provider's ability to obtain reimbursement for the services it provides a Medicaid-eligible patient are not triggered until a provider bills and accepts payment from Medicaid for those services. If a provider chooses not to bill and accept payment from Medicaid, then it remains free to seek its entire customary fee from the patient. Of course, the provider runs the risk of not recovering anything from the patient because the patient may never have the ability to pay his medical expenses, or the third party payment may not come to fruition. The federal Medicaid scheme, however, gives providers the opportunity to make a "calculated choice" whether to seek reimbursement from Medicaid or from the patient.

Like *Spectrum* and *Mallo*, this case involves a provider that asserted a hospital lien on any tort settlement or judgment recovered by an indigent patient before the patient became eligible for Medicaid. Those cases clearly recognized that a provider could assert its pre-existing hospital lien, even after a patient became eligible for Medicaid, so long as the provider did not bill and accept

payment from Medicaid. The providers in *Spectrum* and *Mallo* were both precluded from enforcing their pre-existing hospital liens because they chose to bill and accept payment from Medicaid. But, in this case, Baton Rouge General did not bill and accept Medicaid. Instead, it made the "calculated choice" to enforce its lien rather than bill Medicaid. The fact that Alfaro became eligible for Medicaid after Baton Rouge General established its lien and after he was discharged from the hospital does not strip the hospital of its pre-existing lien against his tort settlement, which is enforceable because Alfaro is in debt to the hospital for his medical bills. *See* LA. REV. STAT. ANN. § 9:4751 *et seq*.

## CONCLUSION

If Baton Rouge General had been required to cover Alfaro as a Medicaid patient, as discussed in Part 1 above, Louisiana validly required the hospital to engage in "cost avoidance" by pursuing the tortfeasor before billing Medicaid (and submitting to its reimbursement limits). We hold, consistent with the caselaw, that Baton Rouge General validly exercised its alternative option to pursue recovery of its costs exclusively from the tortfeasor rather than from Medicaid. For the reasons stated, the judgment of the district court is AFFIRMED.

U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

NOV 19 2008

ROB____ _____ELL, CLERK
BY_____
DEPUTY

# United States Court of Appeals
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

CHARLES R. FULBRUGE III
CLERK

TEL. 504-310-7700
600 S. MAESTRI PLACE
NEW ORLEANS, LA 70130

November 14, 2008

Mr Robert H Shemwell, Clerk
Western District of Louisiana, Lafayette
United States District Court
300 Fannin Street
Suite 1167
Shreveport, LA 71101

        No. 07-30378 Miller v. Gorski Wladyslaw Est
             USDC No.   6:05-CV-189
                        6:04-CV-1250

Enclosed, for the District Court only, is a certified copy of the
judgment issued as the mandate.

Enclosed, for the District Court only, is a copy of the court's
opinion.

Record and exhibits to be returned.

The electronic copy of the record has been recycled.

                    Sincerely,

                    CHARLES R. FULBRUGE III, Clerk

                            Dantrell Johnson

                    By: _____
                        Dantrell Johnson, Deputy Clerk
                        504-310-7689

cc: (letter only)
    Honorable C Michael Hill
    Mr Neal Risley Elliott Jr
    Mr Russell Stanley Post
    Mr William C Kaufman III

P.S. to Judge Hill:  A copy of the opinion was sent to your
office via email the day it was filed.

MDT-1